In the Matter of VINCENT J. KANE et al., on Behalf of Themselves and All Others Similarly Situated, Petitioners, against PATRICK WALSH, as Fire Commissioner and Chief of the Fire Department of the City of New York, Defendant.

Supreme Court, Trial Term, New York County, March 24, 1944.

*David A. Savage* for petitioners.

*Ignatius M. Wilkinson, Corporation Counsel (Seymour B. Quel* of counsel), for defendant.

VALENTE, J. The petitioners, four uniformed firemen of the Fire Department of the City of New York, have instituted this proceeding under article 78 of the Civil Practice Act to enjoin the Fire Commissioner from enforcing Special Order No. 258 issued by him on December 20, 1943.

This special order substantially provides that all uniformed members of the Department shall serve three additional eight-hour tours of " added duty " in every twenty days. This would represent an increase of eight hours weekly over the usual time requirements of the " three platoon system " as set forth in section 487a–11.0 of the Administrative Code of the City of New York (L. 1937, ch. 929). In short, that section provides for a division of the uniformed personnel of the Department into three shifts or platoons, and that no member thereof shall be assigned to more than one tour exceeding eight hours in any day except " in the event of conflagrations, riots or other similar emergencies * * * in which events such platoons or members thereof shall be continued on duty for such hours as may be necessary." It is the petitioners' claim that since no conflagration or other similar emergency existed when the special order was issued, the issuance of such order by the Commissioner is arbitrary and therefore void. On the other hand, it is contended on the Commissioner's behalf that an acute manpower shortage exists in the uniformed forces during the present war emergency and the interests of public safety demand the performance of extra hours of service by this personnel. The head of the Department maintains that this shortage results from

vacancies caused by retirements, resignations, military leaves and conditions incidental to the increased wartime services required of the fire-fighting force and that all these factors when considered together constituted an "emergency" within the meaning of section 487a–11.0 of the Administrative Code empowering the Commissioner to modify the three-platoon system to the effect set forth in the special order. In this connection the Commissioner asserts that this section of the Administrative Code confers on him the power to determine the existence of an emergency and his finding in that respect may not be disturbed in the absence of bad faith.

While the Commissioner points out that by two previously issued orders members of the Department performed extra tours of duty, and the present order therefore contemplates hardly more added duty from the uniformed forces than that previously performed, nevertheless, I cannot regard that circumstance as estopping the petitioners from questioning the validity of Order No. 258.

Section 15 of the City Home Rule Law states that no local law may be adopted which "Reduces the * * * compensation of a city officer or employee, increases his hours of employment * * * if such * * * hours or conditions have been fixed by a state statute and approved by the vote of the qualified electors of such city." Section 12 of article IX of the New York Constitution prohibits any salary reduction or change in working conditions or hours of employment theretofore approved by referendum pursuant to a law except upon approval by a majority of the electors of the city voting thereon. The pertinent section of the Administrative Code of the City of New York establishing the three-platoon system was enacted by chapter 946 of the Laws of 1936 which was passed by a two-thirds vote of the Legislature, and by an affirmative vote of a majority of electors of the City of New York voting upon the proposition. Section 487a–11.0 of the Administrative Code legally fixes eight hours as the number of hours firemen shall work, except in the event of certain emergencies specified in the statute, when such platoons "shall be continued on duty for such hours as may be necessary." Clearly then no power is resident in the Commissioner to continue members on duty for hours in excess of those prescribed by section 487a–11.0 of the Administrative Code "except in the event of conflagrations, riots or other similar emergencies". Any other conclusion would vest in the head of the Department the authority to override both the Legislature and the electorate.

The primary question here involved is one of construction. Does the term " or other similar emergencies " as used in the section refer to emergencies *ejusdem generis* with those particularized, viz., " conflagrations ", " riots ", or has the term a wider and more plastic meaning? Petitioners contend that the present wartime emergency is not such as contemplated by the Legislature under the rule of *ejusdem generis*. They maintain that under that doctrine the term " similar emergencies " must be limited in its interpretation by the preceding words " conflagrations " and " riots ", and that it would be an unreasonable construction to include within the purview of the exception a manpower shortage, or a recognizable fire hazard of a more or less continuous nature resulting from wartime activities in and about the city. I hesitate to subscribe to such a narrow and limited impression for in my opinion the possibility or threat of a conflagration or riot is an emergency similar to that of an existing conflagration or riot, and therefore comes within the contemplation of the exceptions set forth in the statute. Obviously any other doctrine would lead to some palpably absurd results and defeat its very objects. The doctrine of *ejusdem generis* requires no more than that all things contemplated by the general language following the use of particular words be of the same general class or character as the particular thing specified. (*People* v. *Kaye,* 212 N. Y. 407.) Moreover, that rule " must be controlled by another equally general rule, that statutes ought, like wills or other documents, to be construed so as to carry out the objects sought to be accomplished by them " (*People* v. *Kaye, supra,* quoting 27 Halsbury's Laws of England, p. 145; *People* v. *131 Boerum Street Co.,* 233 N. Y. 268). Furthermore, the interpretation for which the petitioners contend would tend to defeat its purpose. In *Danciger* v. *Conley* (248 U. S. 319, 326) the court in discussing the rule, among other things, said: " Its proper office is to give effect to the true intention of that body, not to defeat it." The fact that knowledge of a critical situation is possessed in advance certainly contemplates preparations for readiness to meet the occurrence of an emergency. A fire-fighting force must of necessity be prepared for emergencies or sudden happenings. The threat itself may constitute the emergency. (*People ex rel. Usoy* v. *Waring,* 52 App. Div. 36.) To hold that the statute intended otherwise, and that the Commissioner's power could be enforced only when the conflagration or riot was in progress, would be destructive of the purposes for which the Department exists, the prevention and extinguishment of fire and the protection of life and property.

Ever since the outbreak of the World War in September, 1939, the Federal, State and Municipal Governments have recognized the existence of emergencies. The President of the United States on September 8, 1939, first declared that a national emergency existed and this was followed by a declaration on May 27, 1941, that an unlimited emergency existed. Congress, the Navy Department, the City, and the State of New York (New York State War Emergency Act; L. 1942, ch. 544, as amd.) have at various times since the commencement of hostilities similarly recognized the emergency. Reference to other instances I believe unnecessary.

The facts disclosed at the trial indicate a substantial shortage of the minimum complement of the uniformed force necessary to adequately protect the residents of the city and their property in the event of fire. This reduction in manpower becomes a more pronounced factor when viewed in the light of increased wartime necessities for fire protection. The court cannot ignore the fact that wartime activities and conditions have clearly increased the fire hazards both in the city of New York and elsewhere, and that the threat of conflagration under such conditions is greater than in normal peacetime. The embarkation of troops, the storage and transportation of munitions, explosives, volatile inflammable liquids and combustibles, the equipping and refitting of ships, the conduct of war industries, all have a tendency to considerably increase the fire hazard. It is impossible to ignore these realities for evidence of the emergency is revealed to us on every side. Clearly the war has brought with it additional risks to the safety of the city and its inhabitants, which it is the duty of the Fire Commissioner to meet with proper precautionary measures. Aware of a variety of dangers which have created an emergency he has issued an order modifying for this crucial period the three-platoon system. The adoption of that method, in his opinion, is the only practical way to cope with this exigency. Under the facts and circumstances presented in this proceeding the court is of the belief that the Commissioner's order should not be disturbed by it, and the petitioners' application is therefore denied. Settle order.